UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICO RAMON YOUNGBLOOD,<br><br>    Plaintiff,<br><br>    v.<br><br>MEDEIROS, et al.,<br><br>    Defendants. | Case No. 16-06493 EJD (PR)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br><br>(Docket No. 41) |

    Plaintiff, currently a California inmate, filed a pro se civil rights complaints under 42 U.S.C. § 1983 based on events that took place during his detention at the Sonoma County Main Adult Detention Facility ("MADF"). The Court found the amended complaint, (Docket No. 16), liberally construed, stated a cognizable Eighth Amendment claim for deliberate indifference to Plaintiff's serious medical/mental health needs, and scheduled briefing on the matter. (Docket No. 30.) Defendants Deputy Medeiros, Deputy Patrick, Deputy J. Alcala, Sgt. Saya, Lt. M. Merchen, and D.G.O. Sheets filed a motion for summary judgment asserting that there are no genuine issues of material fact. (Docket No. 41, hereafter "Mot."[1]) Plaintiff filed an opposition, (Docket No. 91), and Defendants filed

---

[1] In support of the motion, Defendants provide the declarations of Defendants M. Merchen, (Docket No. 43), J. Alcala, (Docket No. 44), J. Medeiros, (Docket No. 45), M. Patrick,

a reply, (Docket No. 90). For the reasons discussed below, Defendants' motion for summary judgment is **GRANTED**.

## DISCUSSION

### I. Statement of Facts[2]

On April 6, 2016, Plaintiff was arrested and placed at MADF[3] as a pretrial detainee. (Sheets Decl. ¶ 3.) All the named Defendants in this action are correctional staff and employees of the Sonoma County Sheriff's Office, and worked at the MADF during the relevant time period of this action. Plaintiff had been housed several times in the past in the MADF (since 2009) as well as other state institutions. (Id.) A classification officer will interview every inmate booked in the facility within the first 48 hours of their booking to determine whether a different classification is appropriate, for purposes of housing. (Saya Decl. ¶ 3.) When Plaintiff arrived in the MADF booking area for processing on April 6, 2016, Defendants Medeiros and Sgt. Patrick classified him as an Administrative Segregation ("Ad-Seg") inmate based on the fact that that he was last classified as Ad-Seg during his previous incarceration. (Patrick Decl. ¶ 3; Medeiros Decl. ¶ 3; Merchen Decl. ¶ 3.) When a prior Ad-seg inmate returns to the facility after having been housed at the MADF previously, that inmate typically returns to the same housing classification that he had when he was last housed. (Id.; Saya Decl. ¶ 3.) There were also several other reasons why Plaintiff was classified as Ad-Seg: (1) the nature of the current felony charge he was in for; (2) his past behavior history in MADF and other correctional facilities; (3) the excessive number of major rule violations (thirty) that he had in his corrections file upon

---

(Docket No. 46), J. Sheets, (Docket No. 47), and E. Saya, (Docket No. 49).

[2] The following facts are undisputed unless otherwise indicated.

[3] The MADF is a County-operated correctional facility in Santa Rosa, California.

2

booking; and (4) the fact that he had been in an altercation in January 2016 (his most period of incarceration with MADF before wherein he was jumped while in general population by four inmates who identify as "Norteno" gang members, which is the same gang that Plaintiff self-identifies with. (Saya Decl. ¶ 3.) Ad-Seg inmates cannot be housed in general population because they are at risk of injury or pose a risk to others. (Merchen Decl. ¶¶ 1, 3; Alcala Decl. ¶ 3.) Plaintiff had the option of being housed in Protective Custody ("PC") but he refused each time he was offered it as an alternative to Ad-Seg. (Id.; Merchen Decl. ¶ 4.)

According to Plaintiff, he was booked into the MADF without a screening for his pre-existing medical and mental health issues. (Youngblood Decl. ¶ 4, Docket No. 91-1.) On the same day, Plaintiff submitted an inmate mental health request form "due to an emergency [he] was having in regards to being off of [his] medication and that [he] was suffering." (Id. at ¶ 5, Ex. 3.) Plaintiff suffers from panic disorder, anxiety, chronic depression, insomnia, and adjustment disorder. (Id. at ¶ 6.)

Correctional staff is neither medically trained nor responsible for providing medical treatment or mental health treatment to inmates. Correctional deputies are trained to perform CPR, but the inmate medical and mental health care is contracted out to outside providers. During the relevant time period in this action, medical services were provided by California Forensic Medical Group, Inc. ("CFMG"). Mental health services were provided by the Department of Human Services, which is not part of the Sonoma County Sheriff's Office. None of the defendants named in this action are medical or mental health providers. (Medeiros Decl. ¶ 7; Patrick Decl. ¶ 7.)

Defendants Medeiros, Sheets, and Merchen, as classification officers, were involved in Plaintiff's classification as an Ad-Seg inmate. Classification officers are responsible for determining the appropriate placement of the inmates based upon several objective factors. (Merchen Decl. ¶¶ 1, 3; Alcala Decl. ¶ 3.) Classification determinations are regularly reviewed by classification officers, and may be reviewed at any time at the

3

request of the inmate. (Patrick Decl. ¶¶ 3, 4.) With respect to Ad-Seg inmates, classification officers will review their status every two weeks or more frequently. (Id. at ¶ 3.) For example, if there is a disciplinary issue or if the inmate has gone a period of time with no incidents or rule violations, he/she may be placed back into a lower housing classification. (Id.) As an Ad-Seg inmate, Plaintiff was regularly reviewed by classification officers, and even more frequently than most because he specifically sought review through the use of Inmate Request Forms ("IRF"). (Id. at ¶ 4.)

According to Plaintiff, at every review before classification officials he expressed his pain and suffering due to the extreme conditions in Ad-Seg, and informed them that he could not sleep, felt like he was dying, and was frightened, terrified, and suicidal. (Youngblood Decl. ¶ 7.) He had a "psychotic break that changed [his] life forever," and references a grievance filed on July 25, 2016, complaining that he was "trapped" in Ad-Seg, had hit the emergency call button due to mental anguish, and he was suffering. (Id., Ex. 5.) Plaintiff asserts that Defendants Merchen, Saya, and Sheets were all "personally involved with this grievance" as their signatures are clearly indicated on the document. (Id.)

IRFs are available in every module and also by request of an inmate to a correctional deputy, whether for medical or mental health services or for requests not involving medical assistance. (Merchen Decl. ¶ 4; Alcala Decl. ¶ 5; Medeiros Decl. ¶ 7; Patrick ¶ 7; Saya Decl. ¶ 5.) IRFs directed to medical or mental health services go directly to those providers, not to custody. (Merchen Decl. ¶ 4.) Furthermore, any grievances that Plaintiff made directly to medical or mental health staff that did not involve custody are considered medical records and are not available to correctional staff. (Id.) HIPAA protects an inmate's medical and mental health records from disclosure. (Id.) Custody is not privy to, has no access to, and cannot review any of those records. (Id.) However, if an inmate files a grievance and it relates in some or in total to the inmate's medical treatment and/or mental health treatment, the grievance is handled by a grievance officer.

4

(Id.)

Between April 2016 and the time the amended complaint was filed in February 2017, Plaintiff filed approximately a dozen IRFs, classification appeals, and grievances that pertained to classification. (Merchen Decl., Ex. A; Alcala Decl., Ex. A; Sheets Decl., Ex. A.) When an inmate's presence in a housing unit may be harmful to the inmate or to other inmates with whom he/she is housed due to gang affiliations and/or past gang-related activities or incidents, precautions must be taken in order to diligently try to safeguard the health and safety of all inmates. (Patrick Decl. ¶ 5.) In Plaintiff's case, the only appropriate housing options were Ad-Seg or Protective Custody ("PC"). (Id.) The facility could not risk further injury to him by placing him with members of his own self-identified gang who had jumped him and physically assaulted him in January of 2016, nor could he be placed with members of other rival gangs due to his self-identification as a Norteno gang member. (Id.) This was explained to Plaintiff on several occasions by staff at the MADF, but he continually refused PC housing. (Id.) Had Plaintiff accepted the housing assignment in Protective Custody, his commissary would not be as limited as it is in Ad-Seg; more group classes would have been available to him; and his out of cell time would have been increased. (Id. at ¶ 6.) Plaintiff knew all of this, and yet did not want to be housed in Protective Custody. (Id.) His refusal to accept PC housing left the facility no other option, which was explained to him several times. (Id.) However, his choice to remain in Ad-Seg did not limit in any way his access to medical or mental health services. (Id.) The same request forms (IRFs) are available in Ad-Seg, as in every other module, and can be picked up by an inmate at any time, or an inmate may ask a deputy for a form. (Id.) The completed forms are sent in daily either to custody (if the request is related to a custodial issue), to mental health workers (if the IRF is seeking mental health services), or to the medical staff (if the IRF is seeking medical services). (Id.) None of these services are limited in any way because of an inmate's housing status. (Id.; Medeiros Decl. ¶ 6.)

Defendant Saya's interactions with Plaintiff involved his repeated requests for

5

change in classification and housing. In some of these interactions, Plaintiff claimed he had not been seen by mental health and/or medical staff. Each time he reported this to Defendant Saya, a special request either orally or in writing was made for Plaintiff to be seen by mental health or medical staff. (Saya Decl. ¶ 4, Ex. A.) On one occasion, Defendant Saya summoned mental health staff to see Plaintiff based on a grievance in which he stated he was suffering "mental anguish," even though Plaintiff had not specifically made such a request of Defendant Saya. (Id.) According to Plaintiff, on September 24, 2016, he filed an IRF directed to Defendant Saya to see about being moved to "F" or "R" module, which are alternative housing units for inmates with mental and medical issues, and also pointing out that he had no disciplinary issues. (Youngblood Decl. ¶ 9, Ex. 6.)

Defendant Merchen was the classification lieutenant who reviewed many of Plaintiff's grievances and classification appeals, and met with Plaintiff numerous times. (Merchen Decl. ¶ 3.) Plaintiff's refusal to accept PC housing was repeatedly brought up. (Id. at ¶ 4.) In a grievance response dated September 16, 2016, it is documented that Defendant Merchen met with Plaintiff who claimed that he was "trapped" in Ad-Seg and was "suffering severe mental anguish" and deliberately ignored by mental health staff. (Id.) Plaintiff informed Defendant Merchen that he had been seen twice by mental health staff, and that he submitted an IRF to mental health that had not been responded to. (Id.) Defendant Merchen contacted the Mental Health manager right away, and Plaintiff was seen that afternoon. (Id.) In late October 2016, Plaintiff submitted an IRF that stated the module was all going on a hunger strike, and he was placed in an observation cell as he was found to have hidden a large number of Trazadone pills in his cell. (Id. at ¶ 6.) Plaintiff denied suicidal ideation, but was placed in an observation cell in an abundance of caution. (Id.) He remained there until he decided his hunger strike was over. (Id., Ex. B.) Then in November 2016, Defendant Merchen responded to Plaintiff's claim that he had not been seen by medical or mental health (which he had been), but Defendant Merchen

6

nevertheless asked both departments to follow up with Plaintiff, and ensured that Plaintiff was not suicidal and that he had a mental health review on schedule within days. (Id. at ¶ 4.) According to Defendants, this is typically how mental health and/or medical requests that come to custody are dealt with since the individual deputies, sergeants and lieutenants are not health care providers. (Id.) Defendants assert that custody will ensure to the best of their abilities that inmates, regardless of where they are housed, are seen by medical or mental health providers as requested, when those requests come directly to custody instead of going to medical and/or mental health staff. (Id.) According to Plaintiff, in November 2016 he was placed in a "pee and feces infested room for 3 days and th[e]n thrown back into 'Ad-Seg.'" (Youngblood Decl. ¶ 12.) Plaintiff also asserts that on November 11, 2016, he submitted an IRF directed to Defendants Saya and Alcala, appealing his classification due to the harsh conditions of isolation and requesting a transfer to "mental health mod" based on his mental health needs. (Id. at ¶ 13, Ex. 11.)

Correctional staff is neither medically trained nor responsible for providing medical treatment or mental health treatment to inmates. Correctional deputies are trained to perform CPR, but the inmate medical and mental health care is contracted out to outside providers. During the relevant time period in this action, medical services were provided by California Forensic Medical Group, Inc. ("CFMG"). Mental health services were provided by the Department of Human Services, which is not part of the Sonoma County Sheriff's Office. None of the defendants named in this action are medical or mental health providers. (Medeiros Decl. ¶ 7; Patrick Decl. ¶ 7.)

## II. Summary Judgment

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof

7

at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Cattret*t*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. See Celotex Corp., 477 U.S. at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id. at 325. If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted. See Liberty Lobby, 477 U.S. at 249-50.

The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 324 (citations omitted). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." Id. at 323.

The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a material fact. See T.W. Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. See id. at 631. It is not the task of the district court to scour the record in search of a genuine issue of triable fact. Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir.

8

1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. Id. If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. See id.; see, e.g., Carmen v. San Francisco Unified School District, 237 F.3d 1026, 1028-29 (9th Cir. 2001).

### A. Deliberate Indifference

During the relevant period of this action, Plaintiff was a pretrial detainee at MADF. Because a pretrial detainee has not been convicted of a crime, but has only been arrested, the detainee's right to receive adequate medical care derives from the Due Process Clause of the Fourteenth Amendment rather than from the Eighth Amendment's protection against cruel and unusual punishment. Gibson v. County of Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002) (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)); Castro v. Cnty. of Los Angeles, 833 F.3d 1060, 1067-68 (9th Cir. 2016) (en banc). The Fourteenth Amendment also guarantees that pre-trial detainees receive constitutionally adequate mental health care. Conn v. City of Reno, 591 F.3d 1081, 1094 (9th Cir. 2010), vacated on other grounds, 131 S. Ct. 1812 (2011). The appropriate standard for evaluating a pretrial detainee's medical claim is the deliberate indifference standard under the Eighth Amendment. See Carnell v. Grimm, 74 F.3d 977, 979 (9th Cir. 1996) (8th Amendment guarantees provide minimum standard of care for pretrial detainees); see also Castro, 833 F.3d at 1068 (under both the Eighth and Fourteenth Amendments, the inmate must show that the prison official acted with deliberate indifference).

A mentally ill prisoner may establish unconstitutional treatment by prison officials by showing that officials have been deliberately indifferent to his serious medical needs. See Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994); see also Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982) (mental health care requirements analyzed as part of general health care requirements). A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and

9

wanton infliction of pain. Doty, 37 F.3d at 546. Furthermore, the prisoner must establish that officials possess a sufficiently culpable state of mind by showing that officials were both subjectively aware of the serious medical need and failed to adequately respond to that need. Conn, 591 F.3d at 1096. Additionally, the officials' actions must be the cause of the injury suffered as a result of their deliberate indifference. Id. at 1098.[4]

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he must actually draw that inference. Id. If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. Gibson, 290 F.3d at 1188.

**B.  Analysis**

Plaintiff claims that he has suffered severe mental anguish and psychological torture due to the harsh conditions of confinement in Ad-Seg. (Am. Compl. at 5, 8.) He claims that he repeatedly alerted Defendants of his suffering, and yet Defendants took no action. (Id. at 8-10.) Plaintiff claims that beside his mental issues, he also suffers physical from hypertension and loss of vision. (Id. at 11.) Based on these allegations, Plaintiff claims that Defendants Merchen, Saya, Patrick, Medeiros, and Alcala were "maliciously and deliberately indifferent to [his] serious medical/mental health needs which exposed [him] to unsafe conditions resulting in serious irrep[a]rable harm." (Id. at 13-17.) Plaintiff claims Defendant Sheets knew of the unlawful deprivation of his rights through his review

---

[4] For example, in Conn, the Ninth Circuit reversed the district court's grant of summary judgment to transporting police officers where the plaintiffs (the children of a pre-trial detainee who committed suicide), presented sufficient evidence for a jury to conclude that transporting police officers (a) must have been subjectively aware that the decedent was at an acute risk of harm (suicide) and suffered a serious medical need; (b) failed to respond properly to such risk by informing jail officials; and (c) such failure was both the actual and proximate cause of the decedent's suicide once at the jail. See id. at 1097-1102.

10

of Plaintiff's numerous IRFs and grievances and yet did nothing to stop the unlawful deprivation of rights. (Id. at 14-15.)

Viewing the evidence in the light most favorable to Plaintiff, the Court finds there is no genuine dispute as to any material fact relating to Plaintiff's claim of deliberate indifference against Defendants. Assuming Plaintiff's medical condition was "serious," he fails to satisfy the second prong, i.e., that Defendants were subjectively, deliberately indifferent to his medical/mental needs because they failed to take reasonable steps to abate a substantial risk of serious harm. See Farmer, 511 U.S. at 834, 837.

First of all, with respect to his initial classification at booking, Plaintiff fails to show that Defendants knew there was a risk of harm and yet disregarded that risk by classifying him as an Ad-Seg. *See supra* at 2. Plaintiff claims that he was booked into the MADF without a screening for his pre-existing medical and mental health issues which "alone has been shown to constitute deliberate indifference." *Id.* at 3. In opposition, he provides a copy of the "Administrative Segregation Placement Hearing" report dated April 6, 2016, and a "Booking Tracking Form" both lacking his signature, which he asserts is an indicator that he was not properly screened. (Payan Decl. ¶ 4, Exs. 1 and 2.) Defendants argue in reply that the second of these documents includes a "medical/mental health sign off" signed by "Medic name: C. Bogart," which is proof that Plaintiff *was* screened by medical staff upon booking. (Reply at 3.) The Court is not persuaded that this document is proof that Plaintiff was in fact "screened" for pre-existing medical conditions by medical staff upon booking since the form contains no specific information regarding such an examination. However, the Court agrees with Defendant that Plaintiff fails to submit any evidence establishing that he had any "pre-existing" condition for which he needed to be screened. (Id.) Furthermore, even if we assume that he did suffer from panic disorder, anxiety, chronic depression, insomnia, and adjustment disorder as he claims, Plaintiff provides no evidence showing that Defendants actually knew at booking that he had these mental health issues which needed immediate attention and that they failed to adequately

11

respond to that need. See Conn, 591 F.3d at 1096. Rather, Plaintiff points out that he submitted an inmate mental health request form on the same day that he was booked. (Payan Decl. ¶ 5, Ex. 3.) The fact that he had access to such a form which was received by staff the same day indicates that Defendants did not deny him access to mental health care nor delay access to such care. Nor is there any evidence that Defendants were aware the Plaintiff was lacking his medication, as asserted in the request, since this form went directly to mental health staff and not to custody. *See supra* at 4. Accordingly, Plaintiff has failed to establish that there were sufficient facts from which Defendants could and did in fact infer that an excessive risk of harm existed at the time of Plaintiff's booking, and yet failed to act. See Farmer, 511 U.S. at 837; Gibson, 290 F.3d at 1188.

Defendants object to Plaintiff's submission of several declarations by other inmates in Ad-Seg with his opposition. (Reply at 2.) These declarants assert their own personal complaints regarding placement in Ad-Seg with its harsh conditions, and contain no facts that are material to the Defendants in this matter. (Opp., Exs. 15-18.) The Court agrees that these declarations are not relevant to this action because there is no information provided therein with respect to any Defendants in this matter. Furthermore, it is not disputed that placement in Ad-Seg comes with harsher restrictions, but whether Plaintiff had a right to avoid them is a matter of due process, not deliberate indifference. See, e.g., Toussaint v. McCarthy, 801 F.2d 1080, 1091-92 (9th Cir. 1986) (applying Hewitt v. Helms, 459 U.S. 460 (1983)), cert. denied, 481 U.S. 1069 (1987). Plaintiff did not raise a due process claim with respect to his placement in Ad-Seg, (see generally Am. Compl.), and even if he had, the evidence submitted by Defendants clearly shows that there were valid reasons for his classification as Ad-Seg, and that he was given regular reviews, even more frequently than most, because he repeatedly sought review through IRFs, grievances, and appeals. *See supra* at 4. Furthermore, Plaintiff had the option of avoiding these harsh conditions by opting for PC housing, but he chose not to. *See infra* at 14-15. Accordingly, it cannot be said that Defendants unlawfully imposed the harsher conditions of Ad-Seg

12

onto Plaintiff without due process.

As mentioned above, the undisputed evidence also shows that there were valid reasons to keep Plaintiff in Ad-Seg, where he had no lack of access to medical or mental health care. It is undisputed that in January 2016, Plaintiff had been jumped and physically assaulted by members of his own self-identified gang. *See supra* at 2-3. Nor is it disputed that Plaintiff would have been at risk of injury if placed with members of other rival gangs due to his self-identification as a Norteno gang member. *Id.* Accordingly, it cannot be said that the decision to keep Plaintiff on Ad-Seg or other "no-mix" status was deliberately indifferent in light of these concerns for his safety. In addition, Plaintiff's Ad-Seg placement did not interfere with his access to medical or mental health care. The undisputed evidence clearly shows that Plaintiff was able to submit a dozen IRFs, classification appeals, and grievances that pertained to classification and often times also indicated medical or mental health care needs which prompted classification staff to contact appropriate health care staff. *See supra* at 5. For example, Defendants Saya and Merchen contacted medical and mental health staff on behalf of Plaintiff in response to his grievances which indicated therein that health care was needed without being asked of Plaintiff. *Id.* at 5-7. Furthermore, it is evident from Plaintiff's exhibits that he had access to and was readily able to submit inmate mental health request forms from the first day of his detention at MADF. (Payan Decl., Ex. 3.) Accordingly, it cannot be said that the decision to keep Plaintiff in Ad-Seg constitutes deliberate indifference when it was necessary for his safety and he had continuous access to medical or mental health care as needed.

Plaintiff also claims that Defendants ignored his requests to be moved to a Mental Health ("MH") module although he had mental and medical issues. (Am. Compl. at 7.) However, the undisputed evidence shows that housing to an MH module is based on mental health staff assigning an internal behavior code based on their clinical assessment of the inmate's mental stability and behavior. (Merchen Decl. ¶ 7.) Mental health staff

13

never assigned an internal behavior code to Plaintiff. (Id.) Although classification staff can administratively house an inmate in the MH modules, such assignments are rare and generally due to specific, continued disruptive behavior in other housing assignments; the MH modules allow for closer direct supervision to manage those types of behaviors. (Id.) According to Defendants, Plaintiff never demonstrated those behaviors at a level that would indicate a need for an administrative assignment to an MH module. (Id.) According to Plaintiff, he had a "psychotic break that changed [his] life forever" sometime in July 2016, which only came to the Defendants' attention through a grievance he filed on the matter. *See supra* at 4. In response to that grievance, Defendant Merchen, as the reviewing lieutenant, contacted mental health staff and ensured that Plaintiff was seen by them. (Merchen Decl. ¶ 4.) Defendant Sheets confirmed that Deputy Erion, not a party to this action, referred Plaintiff to mental health staff the same day the grievance was submitted. (Id., Ex. A at 6.) Plaintiff provides no evidence to contradict these facts, and neither does he assert that mental health staff assigned him an internal behavior code based on the incident. Nor is there is any evidence that his behavior was continuously disruptive to warrant an administrative assignment by classification staff. The only other relevant incident was Plaintiff's temporary placement in an observation cell in late October 2016, after he announced a hunger strike and a large number of Trazadone pills were found in his cell. *See supra* at 6. Plaintiff asserts in his complaint that this incident was a "suicide attempt." (Am. Compl. at 10.) However, Defendants submit evidence showing that at the time, Plaintiff actually denied wanting to kill himself but nevertheless, they decided to place him in an observation cell[5] in "an abundance of caution." *See supra* at 6; (Merchen

---

[5] Plaintiff claims that he was placed in a "pee and feces infested room with no socks, no underwear, no bedding, in a freezing cell with no opportunity to clean the room." (Am. Compl. at 10-11.) However, the evidence submitted by Defendants shows that the cell was cleaned before Plaintiff arrived in the module, and that Plaintiff was given cleaning supplies upon request. (Merchen Decl., Ex. A at 13.) Furthermore, nowhere in the grievance complaining of the conditions of this cell did Plaintiff mention lack of socks, underwear, bedding, or the cold. (Id. at 14.) Plaintiff offers no evidence in opposition to indicate that these material facts are in dispute.

14

Decl., Ex. B). This course of action by Defendants is far from deliberately indifferent; rather, they took reasonable steps to abate a risk of serious harm to Plaintiff (at his own hands) by placing him in an observation cell for supervision. See Farmer, 511 U.S. at 837. Accordingly, it cannot be said that the failure to assign Plaintiff to a MH module constituted deliberate indifference when such an assignment was not indicated by mental health staff, his behavior was not so disruptive as to require closer direct supervision, and Defendants took appropriate action when potentially harmful behavior came to their attention.

Lastly, it is undisputed that Plaintiff had the option of being moved to PC housing as an alternative to Ad-Seg, but he repeatedly refused. He offers no explanation in opposition as to why PC housing was not an acceptable alternative to the "extreme conditions in isolation" he suffered in Ad-Seg. (Am. Compl. at 11.) Had he accepted an assignment in PC, Plaintiff's commissary would not have been as limited as in Ad-Seg, he would have had access to more group classes, and his out of cell time would have been increased. (Alcala Decl. ¶ 6.) According to the undisputed evidence, Plaintiff was advised as early as July 28, 2016, that he could accept PC housing instead of Ad-Seg because it was otherwise unsafe for Plaintiff to be returned to general population. (Merchen Decl., Ex. A at 1.) As Plaintiff continued to complain about being in Ad-Seg, Defendants repeatedly explained that he had could choose PC housing, which was less restrictive than Ad-Seg, and that no other options were available to him due to safety concerns. (Saya Decl. ¶ 3; Merchen Decl. ¶ 4; Alcala Decl. ¶ 4.) In light of the fact that Defendants did not ignore Plaintiff's complaints regarding Ad-Seg and had legitimate concerns for his safety if he was placed in general population, it cannot be said that they acted with deliberate indifference in offering him the less restrictive option of PC housing. Because Plaintiff could have exercised this option as early as July 2016, if not sooner, it cannot be said that Defendants were responsible for his remaining in the more restrictive conditions of Ad-Seg and suffering mental anguish thereby. Furthermore, Plaintiff earned himself Ad-Seg status

15

by being involved in an incident (his second in a period of less than a month) in which he refused to obey staff in early December 2016, such that he had to "work himself off of Ad-Seg classification" in order to qualify for PC housing on January 12, 2017. (Alcala Decl. ¶ 4; Merchen Decl. ¶ 5.) Once he had worked himself off of Ad-Seg classification, Plaintiff was rehoused to the "Male Special unit" in PC on January 12, 2017. (Id.)

Based on the evidence presented, Defendants have shown that there is no genuine issue of material fact with respect to Plaintiff's deliberate indifference claim against them. See Celotex Corp., 477 U.S. at 323. In response, Plaintiff has failed to point to specific facts showing that there is a genuine issue for trial, id. at 324, or identify with reasonable particularity the evidence that precludes summary judgment, Keenan, 91 F.3d at 1279. Accordingly, Defendants are entitled to judgment as a matter of law. Id.; Celotex Corp., 477 U.S. at 323.

## CONCLUSION

For the reasons stated above, Defendants Deputy Medeiros, Deputy Patrick, Deputy J. Alcala, Sgt. Saya, Lt. M. Merchen, and D.G.O. Sheets' motion for summary judgment, (Docket No. 41), is **GRANTED**. The claims against them are **DISMISSED** with prejudice.

This order terminates Docket No. 41.

**IT IS SO ORDERED.**

**Dated:** 3/26/2018

EDWARD J. DAVILA
United States District Judge

Order Granting Defs.' MSJ
PRO-SE\EJD\CR.16\06493Youngblood_grant.msj

16